### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 96 CR 815-1 |
| | ) | |
| EDWARD LEE JACKSON, JR. | ) | Judge Tharp |

### JACKSON'S SENTENCING MEMORANDUM

Jackson requests that the Court sentence him to a total sentence of no more than 25 years. He has been incarcerated since December of 1996, and he has earned 1,296 days of good time, every single day that was available for him to earn. A 25-year sentence would permit his immediate release.

Jackson was convicted at a jury trial conducted by Judge Williams. After she was elevated to the Seventh Circuit, Judge Kocoras was assigned the case for the sentencing. At his original sentencing in 2001, Jackson was sentenced to 30 years on the counts not involving use of a gun under 18 U.S.C. § 924(c), and he received an additional 85 years on the five counts under section 924(c). These five gun sentences were mandatory consecutive sentences. Jackson was also sentenced to two years of supervised release and a $25,000.00 fine.

At his original sentencing in 2001, Jackson's guidelines range on the non-gun counts was 360 months to life. That range was established by an offense level of 42 and a criminal history category I. In 2001, the guidelines established mandatory sentencing ranges, and Judge Kocoras imposed a guidelines sentence on the non-gun counts in addition to the 85 years on the gun counts.

While Jackson's case was on appeal the Supreme Court decided *United States v. Booker*, 543 U.S. 220 (2005), and Jackson's case was remanded for the inquiry permitted under *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005). Judge Kocoras responded that he would have imposed the same sentence had he known the guidelines were advisory. R. 818. That question was, however, inconsequential, since the gun counts continued to require an additional 85 years, regardless of the sentence on the non-gun counts.

Since then, four of the five gun counts have been set aside by Judge Kendall in Jackson's post-conviction proceeding. 16 C 7775. (Judge Kocoras recused himself from Jackson's case as well as from all criminal cases, since his son has a supervisory position in the U.S. Attorney's office.)

The updated PSR has found that Jackson's offense level remains at 42 and continues to place Jackson in the range of 360-months to life on the non-gun counts. Jackson has objected to those calculations and maintains that his offense level is 40, which carries a range of 292-365 months.

Regardless of what offense level the Court eventually decides, the Court, of course, has the authority to impose a below-guidelines sentence after considering the sentencing factors set forth in 18 U.S.C. § 3553(a)(2). Although the Court is required to impose at least five years on the gun count consecutive to the sentence on the non-gun counts, it may adjust the sentence on the non-gun counts in light of the mandatory gun sentence, an option that was not available to Judge Kocoras at the time. *Dean v. United States*, —U.S.—, 137 S. Ct. 1170 (2017).

Taking the section 3553(a) factors into consideration, the Court should grant a variance and sentence Jackson to no more than a total term of 25 years. Jackson is also asking that no fine be imposed, since he does not have the financial resources to pay a fine.

Section 3553(a)(1) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant. Section 3553(a)(2) requires the Court to consider the need for the sentence to accomplish various goals.

The PSR and the objections to the PSR set out the nature and circumstances of the offense.

As for Jackson's history and characteristics, Jackson relies on the reports of Jeffrey Eno and Dr. Robert Johnson, attached as Exhibits A and B. Jeffrey Eno is a mitigation specialist with the Federal Defender Program. Dr. Robert Johnson is a Professor of Justice, Law and Criminology at American University in Washington, D.C. Each of these reports is richly detailed.

Mr. Eno's report recounts Jackson's strong and enduring contacts with family and friends, notwithstanding his incarceration in a faraway location, where he has been unable to have even one in-person visit. Letters from Jackson's family and friends, attached as Exhibit C, attest to his efforts to maintain these important relationships, despite the serious obstacles created by his lengthy incarceration. Mr. Eno's report also details Jackson's activities and accomplishments during his incarceration, most notably a totally clean prison record during his almost 20 years

at Cumberland FCI. Jackson's Progress Report from the BOP, attached as Exhibit D, confirms a number of facts, including his 1,296 days of earned good time. (Exhibit D also lists courses Jackson has taken at Cumberland, but this listing is not complete. Jackson is filing a supplement with copies of his certificates for completion of BOP courses.) Mr. Eno's report also details that, during Jackson's time at Cumberland, Jackson has had to cope with the special stress of covid-19, although he has been fortunate enough, so far, to avoid infection. Ex. A, at 11-12.

Jackson's prison record is all the more remarkable when one considers that, because of his lengthy sentence, Jackson has been ineligible under BOP policy for transfer to a prison with a lower security rating. Ex. A, at 6. Jackson has led an exemplary prison life, even though he has had no chance to obtain the most significant external reward that can come from those efforts, that is, transfer to a less restrictive environment.

Dr. Johnson's report provides an expert opinion that, based on Jackson's exemplary prison record, Jackson is in an excellent position for release into society. Dr. Johnson has buttressed this opinion with the results of social science tests he administered to Jackson.

These reports speak to Jackson's history and characteristics, especially the last 20 years. These reports also provide a solid foundation for an assessment of the factors outlined in section 3553(a)(2), which inherently overlap with Jackson's history and characteristics.

**Protection of the public.** There is no need to continue Jackson's confinement in order to protect the public. Jackson is now 51 years old. It is common knowledge that the risk of recidivism significantly declines with a defendant's advancing age. See Dr. Johnson's report at pages 9-10.

Indicators beside his current age point to a risk to the public that is minimal, approaching non-existent. Jackson has now served 25 years in custody. He was confined at the MCC Chicago awaiting trial and sentencing for almost five years, much of that time in administrative segregation. After sentencing, he has served almost 20 years at FCI Cumberland. During those 20 years at FCI Cumberland, he has received no disciplinary reports, which is a remarkable, perhaps unique, achievement. His former employment as a police officer ensured that he would be under special scrutiny by the prison authorities, and it also exposed him to unwanted attention from other inmates.

During those 20 years, Jackson has done much more than merely keeping out of trouble. He has performed his prison work assignments with diligence and enthusiasm, earning uniformly positive evaluations from the prison staff. These evaluations are being submitted as a separate filing. Although counsel requested Jackson's complete BOP file (which he then provided to the government), it appears that the BOP did not provide a complete file, and counsel is filing every evaluation supplied by the BOP. Exhibit D confirms that Jackson currently serves as the lead orderly in Cumberland's recreation department.

During those 20 years, Jackson has completed numerous courses offered by the prison. Certificates for course completions are being submitted as part of the separate filing. Many of these courses have been concentrated in the area of religious studies and physical fitness. Jackson's passion for these two endeavors will assist him in making a life for himself once outside prison. He has the experience and the knowledge to obtain employment as a fitness instructor and personal trainer. He also aims to provide Biblical instruction and counseling to those who wish to avail themselves of his mission.

During his time in prison, he has developed a Biblical ministry through the use of email. Before the pandemic, he was able to reach hundreds of persons who want to take advantage of his insights into the Bible. Once the pandemic began, the prison was no longer able to afford him this platform, but he is eager to resume his mission as soon as he leaves prison. It is his firm intention, once released, to continue his religious outreach and to preach to those who seek his guidance.

Jackson has also participated as a mentor to younger inmates under the auspices of the BOP's Brave (Bureau of Rehabilitation and Values Enhancement) program. He has counseled numerous inmates to pursue positive goals and to reject criminal behavior. Various individuals have reported that his efforts have had a positive impact on their lives after their release from prison. See report of Jeffrey Eno, attached as Exhibit A to this filing, at pages 9-10.

These objective facts indicate that, if released today, Jackson does not pose a danger to the community. According to Dr. Robert Johnson, whose report is

attached as Exhibit B, Jackson's prison record makes him as likely to commit an offense as someone with no criminal record. Ex. B, at 2, 10-11. "I have studied prison adjustment for some five decades now and can say with confidence that Mr. Jackson's prison adjustment is in a class by itself. I, for one, have never encountered a better adjusted inmate in my case work or research." *Id*. at 4.

Dr. Johnson's opinion is also based on a battery social sciences tests he administered to Jackson. These tests confirm that Jackson currently has the mature coping skills to pursue a productive, crime-free life. Dr. Johnson has concluded that, "Mr. Jackson BCCS profile is one that is high on most constructive avenues of adjustment and low on all destructive avenues of adjustment. This profile is consistent with his constructive prison adjustment and adds weight to the notion that his positive prison adjustment is the result of active decisions to take charge of his life behind bars and to adapt maturely to the pressures of prison living." Ex. B, at 8.

Jackson has prepared himself for life outside of prison, and he has family and friends who can provide him with a social network. A long-time family friend, who considers him as her second son, has offered him a place to stay in Chicago while he gets on his feet after his release from prison. See Ex. A., at 12. (This benefactor has requested that, for privacy reasons, her name not be made a part of the public record. Counsel stands ready to privately disclose her name to the Court and the government if so requested.) With these resources, Jackson has no reason to engage in criminal behavior in order to support himself.

**Seriousness of the offense.** Section 3553(a) treats seriousness of the offense as part of a package that also includes promoting respect for the law and providing just punishment. Under probation's guidelines calculation, Jackson's adjusted offense level is 42, and his range is 360 months to life, to which at least five years must be added for the gun offense.

Jackson does not dispute the seriousness of the offenses. Jackson submits, however, that such a high sentence is not necessary to acknowledge the seriousness of the offense. First, seriousness of the offense is not a factor to be considered in the abstract; it is a factor to be weighed in conjunction with the other factors, including the defendant's personal characteristics as they currently exist.

Second, even if considered separately, seriousness of the offense does not call for the level of punishment suggested by probation's proposed level 42, with a 360 months to life range, augmented by another five years on the gun count. The average sentence for federal murder, which has the highest average sentence of all the offenses in the federal criminal code, is significantly lower than 360 months. For the six-month period ending March 31, 2021, the mean sentence for federal murder was 220 months, and the median sentence was 198 months. In second place is sexual abuse, with a mean average of 207 months and a median of 180 months. For extortion/racketeering, the mean sentence was 23 months, and the median was 12 months. Ex. E. The government might argue that, given Jackson's position as a police officer, his extortion and racketeering was more egregious than the average extortion/racketeering case, but the government will have no explanation for why

the seriousness of Jackson's offense demands a higher sentence than a sentence for murder.

Nor does the gun count require such a draconian sentence to signify the seriousness of the offense. According to the Sentencing Commission, in fiscal year 2020, the average sentence for someone with a gun count and a non-gun count was 137 months. The average sentence jumped to 199 months for defendants judged to be career offenders, which Jackson is not. And the average sentence climbed even higher, to 245 months, for defendants with multiple gun counts, not a category that applies to Jackson. Ex. F.

**General Deterrence.** As developed above, Jackson poses no threat to society. In other words, specific deterrence does not require his continued incarceration. As for general deterrence, more than 25 years is overkill.

A sentence is said to produce general deterrence to the extent that it warns would-be criminals contemplating crimes similar to the defendant's crimes that punishment is not an abstract possibility, but a reality. 1 Wayne R. LaFave, Substantive Criminal Law § 1.5(a)(4) (3d ed. 2021). Any would-be criminal contemplating a similar crime would likely be deterred by a 25-year sentence and it is difficult to believe that, if 25 years will not accomplish that end, a greater number of years will deter.

Moreover, it is useful to consider what sentences are thought to deter more serious crimes. We return to the average sentence for murder and the average sentences for those with gun offenses, already considered, which speak not only to

the seriousness of the offense, but also to general deterrence. If sentences of 20 years or less are thought to provide general deterrence for murder, it is difficult to understand why a sentence of more than 25 years is necessary to deter police officers contemplating crimes similar to Jackson's crimes.

The Court should also consider sentences sought and imposed in a recent case involving corrupt Chicago police officers. The sentences in that case provide a rough benchmark of what might be considered as an adequate sentence to provide general deterrence.

In *United States v. Elizondo and Salgado*, 18 CR 286 (N.D. Ill.), two Chicago police officers repeatedly and knowingly obtained search warrants with perjured warrant applications. They seized drugs and other property under the authority of these warrants and stole these items from the victims. In one instance, like the defendants in Jackson's case, they raided a phony drug stash house established by the government. They also obstructed justice and committed perjury in an effort to avoid punishment. (A fuller account of their activities is found in the government's brief on appeal. 2021 WL 2071039.) After conviction at trial, their calculated guidelines ranges were 70 to 87 months and 63 to 79 months, respectively. The government asked for 120-month sentences for both, arguing in part that such a sentence was necessary for deterrence. The Court sentenced them to 87 and 71 months, respectively.

Since the government thought 120 months was enough to provide general deterrence in *Elizondo*, it cannot plausibly argue that more than 25 years is

required in Jackson's case. The conduct is essentially the same, with one non-essential difference. In *Elizondo*, it appears that the defendants always employed search warrants, albeit warrants fraudulently obtained. For that reason, the defendants were charged with theft offenses, not extortion offenses. That charging decision greatly affected the guidelines calculations, since theft offenses have a lower base offense level. However, the distinction between theft and extortion does not justify a harsher sentence in Jackson's case. The absence of a warrant in several of the incidents in Jackson's case increases the guidelines calculation for Jackson, but it does not indicate that a higher sentence is necessary for general deterrence.

For these reasons, it is respectfully requested that the Court impose a total sentence of no more than 25 years in prison.

Dated August 25, 2021, at Chicago, Illinois.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By: */s/ William H. Theis*
  William H. Theis
  FEDERAL DEFENDER PROGRAM
  55 E. Monroe Street, Suite 2800
  Chicago, IL  60603
  (312) 621-8300

EXHIBIT A



# FEDERAL DEFENDER PROGRAM

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

55 E. MONROE STREET - SUITE 2800
CHICAGO, ILLINOIS 60603

PHONE 312.621.8300
FAX 312.621.8399

JOHN F. MURPHY
EXECUTIVE DIRECTOR

CHRISTINA L. FARLEY JACKSON
DEPUTY DIRECTOR

ROBERT D. SEEDER
CHIEF TRIAL ATTORNEY

MICHAEL T. WYSOPAL
ADMINISTRATIVE OFFICER

TERENCE F. MacCARTHY
CAROL A. BROOK
DEFENDER EMERITUS

PIYUSH CHANDRA
IMANI CHIPHE
SANTINO COLEMAN
DANIEL J. HESLER
CANDACE JACKSON-AKIWUMI
BETH W. JANTZ
JASMINE J. JOHNSON
MARY H. JUDGE
DANIEL P. McLAUGHLIN
GEOFFREY M. MEYER
AMANDA PENABAD
SERGIO F. RODRIGUEZ
KIMBERLY-CLAIRE E. SEYMOUR
WILLIAM H. THEIS

August 20, 2021

Honorable Judge John J. Tharp
United States District Court Judge

*RE: United States v. Edward Lee Jackson; 96-00815*

Dear Judge Tharp,

My name is Jeffrey Eno and I am a Mitigation Specialist with the Federal Defender Program (FDP) here in Chicago. From December 1993 through December 1996 I was employed by the Capital Litigation Division of the Office of the State Appellate Defender where I served as Chief of the Mitigation Division. Much of my work involved developing mitigation for post-conviction and clemency proceedings. From 1997-2014, I maintained a private practice where I worked in state and federal jurisdictions throughout the country, including the United States Military. Much of my work as a mitigation specialist has involved thoroughly investigating the backgrounds of defendants for purposes of explaining the many influences and life-circumstances that have shaped each individual's development over the course of his/her lifetime. To date I have been involved in a supervisory capacity, as a consultant, and as a direct practitioner in more than 500 felony cases.

In this case, I was asked by Mr. Edward Jackson's attorney to prepare a brief summary report for purposes of highlighting how Mr. Jackson has adapted to and managed his time in prison. The PSR dated January 27, 2000 provides adequate background information specific to Mr. Jackson's life prior to his sentencing in this matter. Information in this report is based on Bureau of Prison records, PSR, multiple interviews with Mr. Jackson, and interviews with

individuals known to Mr. Jackson. This summary report is in no way intended to diminish the seriousness of the offense for which Mr. Jackson has been sentenced. Rather, it is an attempt to provide the Court with specific and relevant information and context for consideration at the time of his resentencing. Since almost two decades have passed since Mr. Jackson has been convicted, he should not be evaluated based on who he was the day of his original sentencing back in 2001, but rather as the person he is today as he stands before this court.

## OVERVIEW

Edward Jackson presently stands before this court for resentencing for his May 5, 1998 criminal conviction. October 18, 2001 Mr. Jackson was sentenced to a term of 1,380 months in the Federal Bureau of Prisons. After his sentence was handed down, Edward Jackson committed himself to serving out his 115 year sentence in a compliant manner consistent with the restrictions and expectations imposed by the Federal Bureau of Prisons. He further committed himself to engaging in meaningful and positive self-development which has enabled him to lead a purposeful and productive life while incarcerated. He explained that self-reflection and personal agency led to insight, positive change, and a healthier attitude and outlook on how to pursue a "life worth living" while incarcerated.

During his 19 plus years of incarceration at FCI Cumberland Mr. Jackson has eagerly engaged in the many pro social opportunities the Bureau of Prisons has to offer. All such programs are geared toward positive growth and development. To his credit, Mr. Jackson has spent over a 1,500 hours in courses and training programs specific to prison adjustment and rehabilitation. The content of these courses has focused on character, interpersonal, cognitive, spiritual, and vocational skills and development. All such factors contribute to prosocial judgement and decision making. Throughout his term at FCI Cumberland he has been entrusted with numerous prison jobs, he routinely participates in various institutional volunteer programming, and he regularly teaches courses and facilitates support groups, both formally and informally. In addition, he mentors young inmates while using himself as an example to teach those individuals the value of recalibrating their lives in a positive manner so they don't end up recidivating once discharged from prison. His goal is to encourage positive citizenship so as to help ensure that others don't have to waste unnecessary years of their lives in prison. Finally, Mr. Jackson spends much of his free time exercising, reading, studying history and religion, and sharing positive life lessons and scripture with fellow inmates, family, and friends.

During his years of incarceration Mr. Jackson has also faced considerable challenges. Despite numerous requests, he has been denied the opportunity by the Bureau of Prisons to be relocated to a prison near his home. Given the geographic distance between Chicago and Cumberland, it has been financially impossible for family members to afford to visit him. Consequently, Mr. Jackson has not had an in-person visit in the over nineteen years he has been

housed at FCI Cumberland. During that time he has grieved the losses of numerous loved ones. His maternal grandmother, both parents, maternal and paternal aunts, a paternal uncle, his two best friends, his Godmother, and various other friends have all died. Nonetheless, throughout the years Mr. Jackson has diligently and conscientiously maintained regular contact with remaining family members and friends through phone conversations, email, and letters. He has clearly expressed and deeply appreciates the value and meaning that family has to him. He continues to remain positive and hopeful that one day he will be reunited with his loved ones.

During his nineteen plus years of incarceration at FCI Cumberland, Mr. Jackson has never been issued a ticket for any rule violation. All of his performance evaluations have been positive (good to outstanding ratings), he has used his time meaningfully and productively to better himself and to encourage others to become better citizens. His almost 20 year carceral record at FCI Cumberland is unblemished, a truly extraordinary accomplishment that speaks to his remarkable overall adjustment, resilience, and rehabilitation.

## BACKGROUND

During Edward Jackson's formative childhood and adolescent years, he faced considerable adversity. According to the PSR he was raised in the Lawndale neighborhood on Chicago's west side. The neighborhood has been characterized as a marginalized, disenfranchised, and under-resourced area of Chicago. It is an area that has been overrun by the negative and corruptive influences of gangs, drugs, and violence. Mr. Jackson reported that during his youth while growing up in Lawndale he witnessed individuals being bullied and beaten up and he heard stories of people getting killed. Perhaps most devastating was witnessing his parents succumb to the destructive forces of addiction. Both of his parents were addicted to both cocaine and heroin. Their addiction left them both physically, emotionally, and psychologically debilitated and unable to care for young Edward. At the insistence of his father, both Edward and his brother were placed in the care of his paternal grandparents who were able to offer a stabile home life. His father also lived in the paternal grandparents' home off and on. "My father is who I look up to because despite his illness/addiction he did not allow the streets to raise either of his children and he fiercely loved and kept us safe."

Mr. Jackson reported that his grandparents were strict, but fair. They encouraged him to lead a positive lifestyle free of gangs and drugs and to do well in school. Growing up Edward appreciated the value in what his grandparents were saying; in return, he did his best to honor their advice. Despite living in an area infested with gangs, Edward stated that he never joined any gang. He reported that he had neighborhood acquaintances who were gang involved, but he never took part himself. Instead, he participated in the many activities offered through school and through the Lawndale YMCA which was located directly across the street from his grandparents' house. He explained that he had a curiosity and thirst for learning new things

which was strongly encouraged by both of his grandparents. In that spirit he played basketball, softball, volleyball, swam, roller skated, boxed, participated in martial arts, engaged in after school programs and took advantage of summer job opportunities.

In high school Mr. Jackson stated that he was "not as focused as I should have been and my grades suffered as a result"; nonetheless, he did graduate from high school. "I was loving it, having too much fun." He recalled that during high school he developed a passion for theater. He stated that he ran track and played basketball. All the while he was developing a new friend group comprised of other kids with similar interests which was distracting in a positive way. After he graduated high school in 1988 he began working at Catholic Charities. Approximately 2½ years after graduating high school Mr. Jackson reported that he sat for and passed the police exam. He later went on to join the Chicago Police force.

April 1991 Mr. Jackson's paternal grandmother passed away, a loss that he grieved deeply. "May 4, 1991, during her burial my son, Edward III, was born." Both the death of Edward Jackson's grandmother and the birth of his son led to a more profound desire to embrace and appreciate family. Against that background he began reaching out to his parents to build a more functional and meaningful relationship with each, despite their addictions. He stated, "I was about as glad for my father that he had a grandson as I was for myself becoming a father." His intentions of developing a close and meaningful bond with his parents was successful. He reported, "I was very close emotionally with my father and mother even though I didn't live with my mother and see her every day." Mr. Jackson reported that he saw each parent as more than their addiction and deeply valued the time he was able to share with each of them. Over the years Mr. Jackson has maintained a strong connectedness to his family and, in turn, they have been a stable source of support in his life.

## ACCEPTING RESPONSIBILITY

To date, Edward Jackson has served over twenty-four years of a 115 year sentence. During his time at FCI Cumberland, Edward has fully come to terms with accepting his punishment. His time in prison has enabled him to think deeply about the person he was prior to incarceration and the man he aspires to be. As a result, Edward Jackson has put forth significant effort while incarcerated to recalibrate the trajectory of his life.

When he first entered FCI Cumberland Edward Jackson wasted little time charting the course for his future. During his more than 19 years in custody at FCI Cumberland he has been focused, disciplined, and goal directed. He dedicated himself to the ongoing self-improvement of his mind, body, and soul. To that end, he has completed and taught an extraordinary number of courses, developed an array of skill sets, worked numerous jobs, actively involved himself in

the prison ministry, counseled and mentored fellow inmates, volunteered his time whenever possible, and he's been a model inmate.

As an example of his progress and commitment to change, a 7/8/05 FIC Cumberland progress report reads: *"Inmate Jackson arrived at this facility on December 10, 2001, and has made a good adjustment. He has developed an appropriate rapport with staff and other inmates. Further, he has completed numerous programs recommended by his Unit Team."*

During his first 3 ½ years of incarceration Mr. Jackson completed 22 courses totaling over 320 hours. During that 3 ½ year period he also worked as an Orderly. All work performance evaluations throughout his years at FCI Cumberland have been positive. The progress report dated 7/8/05 notes that during that evaluation period he instructed over 20 fitness courses during both weekdays and weekends. Some of those courses were short-term while others were ongoing.

The 7/9/05 report continues: *"Inmate Jackson has been a BRAVE Facilitator since August 18, 2004 [Bureau Rehabilitation and Values Enhancement program which are intended to help young inmates adjust to their incarceration.] As a facilitator he has been very helpful to the program. He assisted by speaking with younger inmates in the program to help them in the transition to their incarceration with little difficulty. His interaction was aimed at preventing problematic behaviors. In addition to his regular duties, he organized a Black History Program in March 2004 and March 2005 and developed brief biographies for presentation. He developed an agenda for the presentation and assisted other inmates in practicing their presentations. The presentation was well received by other inmates and staff. In addition, he seeks help from staff on an as needed basis."*

The 7/9/05 report further reads: *"He should be fully employable upon his release from custody."*

This 7/9/05 Progress Report is an early sampling of many institutional progress reports that Mr. Jackson has received throughout his incarceration. ALL reports from FCI Cumberland are positive and speak to the fact that he is actively engaged in institutional programing; that he has a genuine interest and desire in learning and sharing with others the value of lessons learned; that he is consistently employed and volunteers his time regularly; and, that he is trusted by staff with high levels of responsibility.

Despite his exceptional prison record, during his nearly twenty years at FCI Cumberland, Mr. Jackson's security status has remained at Medium. He explained that given his lengthy sentence his security classification status cannot drop below Medium. Mr. Jackson stated that "because of my behavior I have points which classify me for camp status, but because of the

amount of time" of his sentence he is not eligible for camp placement. His explanation is consistent with a handwritten note on an Inmate Request to Staff Member form (requesting closer placement to his family) dated 10/1/07 which states: *"You will only be appropriate for a low security institution once you have 20 years or less remaining in your sentence."*

A second handwritten note dated 10/17/07 states: *"I've reviewed your current custody classification and because of your number of years to serve – you cannot – by national policy – be housed in a low security facility."*

Regardless of the disappointment that Mr. Jackson experienced learning such information, he continued to be a model inmate, actively engage in institutional programming, do all that was asked of him by staff, and continued to work hard at self-improvement.

Family and friends have always been a strong source of support for Mr. Jackson. Over the years he has made several requests to be placed closer to his family. Despite the academic research which suggests that family and community support help facilitate positive community re-entry, DOJ has continually denied Mr. Jackson's request to be closer to his family.



U.S. Department of Justice

Federal Bureau of Prisons

*Federal Correctional Institution*
*Cumberland, Maryland 21502*

Date: January 29, 2008

Reply To
Attn Of: Jeffrey U. Baney
CMC

Subject: Cop-Out Responses

To: JACKSON, Edward Lee
Reg. No.: 07546-424

This memorandum is in response to your written inquiry regarding you being transferred to a facility closer to Chicago, Illinois. You indicate your unit team is unwilling to transfer you because you are within 500 miles of your legal residence.

In reviewing this matter it is clear that your unit team's response is consistent with Bureau of Prisons' policy. Inmate Security Designation & Custody Classification, Program Statement 5100.08, specifically provides that an inmate is not eligible for a nearer release transfer "Once the inmate is transferred within 500 miles of his or her release residence." In addition, the only accepted method of calculating distance accepted by the Bureau of Prisons' is Sentry. According to Sentry, you are 490 miles from your release residence, thus not eligible per Bureau of Prisons' policy.

Consequently, in nearly 20 years Mr. Jackson has not had an in person visit due to the hardship that such travel from Chicago to Cumberland, Maryland would have imposed on his family. Nonetheless, to his credit, Mr. Jackson has maintained ongoing close ties with all family

members and friends.  Numerous individuals have stated that if Mr. Jackson is ever released they would do whatever is required to help support him so as to ensure that his re-entry is successful.

### SIGNIFICANT FACTORS THAT CONTRIBUTE TO REHABILITATION AND POSITIVE RE-ENTRY

*Family Connectedness:*

      For decades, studies have consistently found that inmates who maintain close communication with family members during incarceration function better during their incarceration and have better post-release outcomes, including lower recidivism rates.  According to an Office of Justice Programs report[1], "Five empirical studies of the relationship between inmate-family ties during incarceration and post release success, reported in the post-1970's literature, indicate that maintenance of family and community ties is positively related to better parole outcomes, fewer disciplinary infractions, and lower recidivism."

      Throughout his years of his incarceration Mr. Jackson has maintained regular contact with family and friends.  Through phone calls, letters, and email communication he has remained engaged and up-to-date on the lives of those he cares about.  Together he and family members have shared a deep emotional connectedness regarding life experiences, many which have been filled with heartache, others with triumph, and everything in-between.  Mr. Jackson expressed that he is eternally grateful for the close relationships that he shares with his family and friends.  It is clear through conversations that his family and friends greatly respect Mr. Jackson and feel closely connected to him despite the number of years he's been incarcerated.

*Education and Employment:*

      A 2013 RAND Corporation study[2] commissioned by the DOJ found that inmates who engage in prison education and vocational programing are 43% less likely to recidivate than those who do not engage in such programing.   Further, the study concludes that post release employment among those who took part in vocational programming while in prison is 13% higher than those who didn't participate.  Additionally, individuals who engaged in prison vocational

---

[1] See: Family Ties During Imprisonment: Do They Influence Future Criminal Activity? | Office of Justice Programs (ojp.gov)
[2] See: Justice and Education Departments Announce New Research Showing Prison Education Reduces Recidivism, Saves Money, Improves Employment | OPA | Department of Justice

programming are 28% more likely to be employed after release than those individuals who did not participate in such vocational training opportunities.[3]

According to Edward Jackson's BOP file, he has taken full advantage of the many course offerings available to him at FCI Cumberland. He has participated in more than 1500 class hours of learning and he has over 100 completion certificates. Courses range from institutional programing offerings geared toward health, prison adjustment, and general learning to fitness, history, and religion. A sampling of course titles include: BRAVE (Bureau Rehabilitation and Values Enhancement), Nutrition, Stress Management, Anatomy, Men's Health, Nursing Assistant I & II, MRSA in an Athletic Facility, Basic Theology, Introduction to Hebrew, Ancient v. Modern Language, History of the Middle East, African Civilization, Legendary History, Legends of the Ancients, among many other courses.

All progress reports in Mr. Jackson's BOP file suggest that he is a conscientious and hard worker, the quality of his work ranges from good to outstanding, and that he is both trustworthy and reliable. As Mr. Jackson reports and the records corroborate: "I've been an orderly from 2002 and I worked that orderly job along with recreation beginning around late 2002, I then stopped the orderly job and became primary recreation orderly since 2007. I've had periodic details to work in the kitchen/food service for Passover beginning in 2011 until through 2020 for the eight days of Passover, and for very short periods I've done volunteer work for safety." He continued, "when we were on a very modified schedule in the midst of the pandemic I worked compound, education and recreation, sterilizing, etc." In addition, records reflect that in 2012 Mr. Jackson worked in "staff dining". He has volunteered in areas of sanitation, compound and safety, made notice/available for clean-up crew for blood spill (because of nursing training), snow removal, and distribution of snow cones 2013-2018. Mr. Jackson has been a trusted employee by FCI Cumberland staff and has maintained consistent employment[4] with positive evaluations since shortly after his arrival at the prison.

Mr. Jackson's most recent evaluation dated 8/13/21 notes that "he has worked in the Recreation Department and served as Recreation's lead orderly (Pay Grade 1), and instructed Wellness classes in the gymnasium since before 2013. He is and has been our Lead Instructor during that period, besides on the national modified operations due to COVID."

---

*Religion:*

Most experts would agree that religious programming provides moral rehabilitation and a spiritual pathway for hope during incarceration and for post-prison life. Studies have shown that religion promotes positive mental health.[5]

Mr. Jackson has spent considerable time studying the scriptures, engaging in various religious study groups, and counseling other inmates, family members, and friends about the value and importance of religion. He explained that religion has had a profound impact on his life during his years incarcerated. Religion has provided him focus and solace. His goal is to continue to pursue a life guided by scripture.

*Mentoring:*

The BRAVE (Bureau of Rehabilitation and Values Enhancement) program is nationally recognized as one of the First Step Act approved cognitive-behavioral programs offered by the Bureau of Prisons.[6] The program is designed for young inmates newly entering the BOP to achieve "institutional adjustment". According to the BOP programs manual: "Inmates participate in treatment groups for four hours per day, Monday through Friday. Program content focuses on developing interpersonal skills, behaving pro-socially in a prison environment, challenging antisocial attitudes and criminality, developing problem solving skills, and planning for release."[7] The objectives of the program are positive prison adjustment and rehabilitation.[8]

Early on during his incarceration Mr. Jackson was identified and tasked by staff with teaching in the BRAVE program at Cumberland. In addition, he has continued mentoring inmates both formally and informally, "whenever there's an

---

[5] See: Assessing the benefits of practicing spirituality or religion while incarcerated : a study of formerly incarcerated men in Texas (smith.edu)
[6] See: 2021_fsa_program_guide.pdf (bop.gov)
[7] Ibid.
[8] Cognitive-behavioral treatment modality endorsed by the academic literature for its efficacy in treating patients. This modality focuses on restructuring maladaptive patterns of thinking and behavior while fostering the development of healthy coping skills, increased frustration tolerance, self-esteem, and prosocial judgement and decision making. This model of treatment, CBT, is recognized as an effective tool for reducing recidivism. See: Preventing Future Crime With Cognitive Behavioral Therapy | National Institute of Justice (ojp.gov)

opportunity". Jackson further listed (in an email to this author) programs he's been involved with through which he has used the opportunity to mentor others:

> "i was a mentor / facilitator for the alpha program, i was a facilitator for the religious studies courses/program , i've been the teacher for the messianic service since 2011, i've facilitated/instructed aerobics courses , callisthenic courses, ab courses , yoga courses, stretching courses , iron man courses since 2003, i've facilitates health fairs for the institution since 2007 in fact i've done 2 of them this calendar year april 2021 and one today july 23 2021 where we serviced 350 people with an additional housing unit to be done on 25 july 2021 ,… i've facilitated black history programs and plays and acted as a person known to mentor "numerous " young men."

Mr. Jackson continued:

> "1st thing i speak to them about is loving their fellow man and respecting their fellow man, respecting and caring for elderly, women and children. i absolutely speak with them concerning having a relationship with the heavenly father which will cover all of these areas as well as advising and imploring them to stay away from old crowds that bring about bad situations, i tell them to be patient and have faith and to tell their children and any loved ones at any and all times that they love them because we never know when that situation will change and i use my losses of family to show them. i tell them that continue to look for employment because this system does not need to be a revolving door while at same time letting them know that they have people that care about them who need them and that will help them if they give them a chance and show them that they've changed . inside i implore them to take classes to prepare for society and spiritual courses to build the ever all important relationship with the heavenly father"

It is important to note that I have spoken directly with several individuals who Mr. Jackson has mentored who have since been discharged from FCI Cumberland. All are doing well and leading meaningful and productive lives since their release from Cumberland. They each explained in their own words that they attribute much of their success to the conversations, lessons, and guidance they received from Mr. Jackson. It's clear that Mr. Jackson has had a profound impact on the lives of an untold number of individuals. Many of those

individuals I spoke with are still in communication with Mr. Jackson through email. They continue to reach out to him for advice and guidance, as they truly value his counsel.

*Age:*

The literature has consistently found that as individuals grow older they tend to age out of crime.[9,10]

Other than this case, Mr. Jackson has had no other juvenile or adult criminal convictions. Mr. Jackson was first arrested in this case December 20, 1996 at the age of 26. He has since been in the custody of the Bureau of Prisons. He is currently 51 years of age. He has been incarcerated almost half of his lifetime.

*Length of Sentence:*

Research suggests that the desired deterrent effect of sentencing is generally achieved at the 120 month threshold. In fact, according the Sentencing Commission, individuals "incarcerated more than 120 months were less likely to recidivate eight years after release."[11]

In Mr. Jackson's case he has been incarcerated for nearly twenty five years of his 115 year sentence, almost half of his life. During that nearly 25 period of time his record has been extremely positive.

## COVID-19

Over the last year and a half Mr. Jackson has been serving his time under that threat of COVID-19. He has reported that there have been numerous individuals detained at FCI Cumberland who have fallen ill with COVID-19. He said he has heard (unverified) that there have also been some deaths at FCI Cumberland from COVID-19. Mr. Jackson indicated that he is not currently vaccinated and that his decision is solely guided by his religious beliefs. He further indicated that many other inmates are not vaccinated and staff "aren't taking the vaccine for whatever their reason". He stated that he is taking every precaution to stay healthy. He wears a mask, social distances to the best of his ability, limits physical contact with others, and

---

[9] See: The Effects of Aging on Recidivism Among Federal Offenders | United States Sentencing Commission (ussc.gov)
[10] Criminal behavior declines with age and what is "old" in the prison world? | Path to freedom for the Elderly Prisoner (wordpress.com)
[11] See: Length of Incarceration and Recidivism (ussc.gov)

washes his hands frequently. Nonetheless, he expressed that the stress from the worry of contracting the virus has been challenging.

The mass incarceration epidemic which, in part, has been caused by draconian sentencing practices has led to institutional overcrowding. Most experts would agree that prison conditions at institutions such as FCI Cumberland (aging inmate population, many with underlying conditions; poor sanitary conditions; recycled air; the inability to adequately social distance in confined quarters; low vaccination rates among inmates and staff alike; etc.) are rife for the transmission of COVID-19.[12] Traditionally, prisons are in place for deterrence, punishment, and rehabilitation, not to cause harm.

## FUTURE PLANS

Edward Jackson has spent many years thinking through and carefully developing his plans for re-entry. Foremost, he is looking forward to reuniting and spending quality time with his family and close friends. Many family and friends have expressed a strong desire to help Mr. Jackson locate housing, employment, and whatever else he needs to restart his life in the community.

Mr. Jackson expressed that his primary goal is to secure full-time employment. He intends to utilize the many skills he's developed during his time incarcerated. His hope is that he will land a job as a personal trainer and/or fitness instructor. In addition, he intends to seek out opportunities to teach religious studies classes and preach at a neighborhood church and online. Finally, he is also optimistic that there will be opportunities to mentor younger men. His hope that he can enrich their lives in a manner that will guide them toward living a meaningful life while making a difference in their communities.

If released, Mr. Jackson is hoping to live with a long-time family friend. She resides in Chicago, Illinois. She is 67 years old, retired, and regards Edward Jackson as her second son. Her son and Edward were childhood best friends. She has provided ongoing support and maintained regular contact with Edward Jackson throughout his incarceration. I did speak with her and she expressed that she will provide Edward Jackson with whatever help and support he requires. We talked about reentry programs and I offered her website information regarding two reentry initiatives: Office of the Mayor, Ex-Offender Reentry Initiative and Safer Foundation. She said she will explore both sites, provide Edward the information if released, and work hard to help link him to appropriate programs and services.

---

[12] Abraham, L.A., Brown, T.C. & Thomas, S.A. How COVID-19's Disruption of the U.S. Correctional System Provides an Opportunity for Decarceration. *Am J Crim Just* **45**, 780–792 (2020). See article at: https://link.springer.com/article/10.1007/s12103-020-09537-1

## CONCLUSION

The last 19-plus years Edward Jackson has been incarcerated at FCI Cumberland have been remarkably positive.  The depth of his self-reflection and personal growth have been transformative.  One measure of success in criminal justice is rehabilitation.  Edward Jackson is the definition of rehabilitation.  There is no doubt that Edward Jackson fully accepted his punishment and made every attempt to turn his prison experience into a self-help, personal growth endeavor.  Over the years he worked hard to develop a broad set of skills that will help him to secure stable employment once discharged from his sentence.  Throughout his incarceration he has maintained positive relationships with family members and friends; many of those individuals will help provide him with a safety net of stability, encouragement, and support.  Finally, he has committed himself to giving back to his community by serving as a mentor and positive role-model while encouraging others to lead meaningful and productive lives.  His message is one of hope and healing.  Edward Jackson embodies the true meaning of rehabilitation.

Respectfully submitted,

s/ Jeffrey Eno

EXHIBIT B

**Professional Opinion**
**Re: Edward Jackson**
**By: Robert Johnson, Ph.D.**
**August 9, 2021**

## Professional Opinion

It is my professional opinion, held to a reasonable degree of social scientific certainty, that Mr. Jackson is an excellent candidate for release from prison at this time. I base my professional opinion on a review of Mr. Jackson's institutional file; a 90-minute formal interview conducted by phone with Mr. Jackson on July 20th along with follow-up written exchanges over the next several days; and my review of paper-and-pencil instruments measuring adjustment that were administered during my interview with Mr. Jackson. I also base my opinion on the extensive body of social science research on the adjustment of life-sentence inmates (colloquially known as lifers) and the distinctively low recidivism rates of life-sentence prisoners when these prisoners are released from confinement after many years of incarceration.

Rehabilitation boils down to the will and capacity to live a constructive and non-criminal life in the setting in which one lives, be it the prison or the free community. Mr. Jackson has shown the will and capacity to live a constructive and non-criminal life over the nearly 20 years of his confinement in prison under what amounts to a life sentence: as a lifer, Mr. Jackson he has been a law-abiding, productive, and socially responsible member of the prison community. Rehabilitated inmates like Mr. Jackson are ideal candidates for release from prison, especially when they have, like Mr. Jackson, served sentences long enough to satisfy reasonable concerns for deterrence and retribution.

To cope effectively with his life sentence, Mr. Jackson has learned to manage his prison life on his own terms, showing maturity (careful decision making in which the social environment is responsibly assessed)[1] and self-efficacy (confidence in his ability to manage himself and his responses to environmental pressures in order to achieve his goals)[2]. Where many prisoners flounder or act out or fall back on rote devotion to the prison routine in order to survive the daily pressures of prison living, Mr.

---

[1] For a detailed discussion of mature coping in prison, see Johnson, Rocheleau and Martin (2017)

[2] "Self-efficacy refers to an individual's belief in his or her capacity to execute behaviors necessary to produce specific performance attainments... Self-efficacy reflects confidence in the ability to exert control over one's own motivation, behavior, and social environment. These cognitive self-evaluations influence all manner of human experience, including the goals for which people strive, the amount of energy expended toward goal achievement, and likelihood of attaining particular levels of behavioral performance." https://www.apa.org/pi/aids/resources/education/self-efficacy

Jackson has achieved autonomy and a sense of worth during his confinement. He is a prisoner but he is also, importantly, his own man; as such, he sees himself as both responsible for his behavior and responsible in the way he behaves. To adjust to prison effectively, he has learned how to avoid trouble in a setting where trouble is the norm, how to find and use resources that promote self-improvement in a resource-poor environment, and how to work effectively and relate constructively to fellow prisoners and staff in a setting where destructive behavior is the norm.  Note that as a former police officer—a despised and even reviled category in the prison community—it is especially impressive that Mr. Jackson was able to adjust constructively and avoid conflicts with others in the prison community. It is even more impressive that Mr. Jackson was able to achieve an infraction- and crime-free record in a setting notably hostile to former police officers.

In the process of coping effectively with the rigors of a life sentence, Mr. Jackson has developed the maturity and self-efficacy that are essential to managing one's life responsibly in any environment. Maturity and self-efficacy are illustrated in Mr. Jackson's behavior in prison and affirmed in tests used to assess his coping.  Moreover, by desisting from crime for close to 20 years in the high-crime environment of the prison, a remarkable achievement in itself, Mr. Jackson arguably has a statistical risk of recidivism that is similar to that of a non-offender, which is to say, someone who has never committed a crime. Here I am applying the latest work in desistance research to the prison setting.[3]  As a practical matter, then, Mr. Jackson's risk of returning to crime is negligible, no greater than the risk of committing a crime for someone who has led a crime-free life.

By the standards of the corrections field, Mr. Jackson is rehabilitated. Mr. Jackson is a new man today. That man is a solid citizen of the prison world. When released, it is highly likely that he will be a solid citizen of the free world as well, in large measure because of his personal rehabilitation and in some additional measure as a result of his strong social supports in the free world, which he has maintained during this lengthy prison term and which will certainly aid his successful reentry.

---

[3] "This research reveals that following arrest, a seven-year crime-free period results in statistical similarity between ex-offenders and nonoffenders… The 'time clean' for redemption varies [slightly] by crime type; it is shorter for property offenders (roughly five years) than for violent and serious offenders (roughly eight years)… . These findings provide insight into ways to distinguish those who no longer pose a risk of rearrest or alternatively those who have statistically desisted from offending" (Bersani & Doherty, 2018: 313). Thus, given a 5-8 year crime-free year period, the person's risk of recidivism is statistically similar to that of a non-offender. Mr. Jackson easily qualifies as at low-risk recidivism by this measure, as he is statistically comparable to a non-offender rather as an offender.

I offer my professional opinion with a full awareness that Mr. Jackson committed several rule infractions during his lengthy pretrial confinement some 20 years ago. It is my contention that Mr. Jackson's rule violations were products of the unique pressures of his pretrial confinement experience and do not reduce the significance of the personal growth and maturity he developed over the course of his prison confinement.[4]

**Qualifications**

I am a s. I hold a Ph.D. in criminal justice. Criminal justice is an interdisciplinary field of study devoted to understanding crime and punishment. My primary area of expertise within criminal justice is penology, which is the study of prison life. I research, teach, and testify about prison life as seen in the behavior and adjustment of inmates and staff in general population areas of jails and prisons, as well as in special housing units, including death rows and death houses. I have done extensive research on life-sentence prisoners and prisoners condemned to die, as well as on the staff who work with and manage these prisoners.

I have received over thirty awards for my research and teaching over the course of my career. I am the author of four books on different aspects of prison life, including a text, *Hard Time*, now in a 4th edition, that is a standard text in the field. I am the editor of six books on different aspects of prison life. I have published over 20 chapters in scholarly books, over 50 articles in professional academic journals, and presented over 80 papers at national and international conferences.

Over the course of my career, I have conducted research interviews in roughly 30 prisons spanning ten states, the District of Columbia, England, and Holland. I have also conducted research interviews in a number of large urban jails, and a host of training schools for juvenile offenders. I have conducted research interviews with approximately 1500 prisoners (including 300-350 life sentence prisoners) and 350 staff (including nine members of an execution team) I have had informal discussions with many more prisoners, officers, and officials in local, state, and federal penal institutions. I have been qualified as an expert witness

---

[4] Mr. Jackson's rule infractions during his pretrial confinement are unremarkable given the stressful context of pretrial confinement. Pretrial confinement is "arguably the most difficult part of the incarceration experience" (Toman et. al., 2018: 317); pretrial confinement settings are regularly characterized as "chaotic, violent, and disorderly."[4] Note that Mr. Jackson was kept in a solitary confinement setting for his protection during his pretrial confinement, in recognition of the dangers it was believed he would face in the general jail population as a former law enforcement officer (See SIS Report dated 02/06/97). Good intentions of the MCC administrators aside, solitary confinement imposes psychological stresses above and beyond those found in the general jail population (Haney, 2009; Kupers, 2017).

on over 30 occasions in various jurisdictions – 19 times in Pennsylvania, 20 plus times in Maryland, and several times in the Federal Courts.

**Narrative**

I have been asked by the Federal Public Defenders to interview Mr. Edward Lee Jackson and issue a report as to whether his prison adjustment is such that he is currently a good candidate for release. Mr. Jackson was arrested, arraigned, and detained on December 20, 1996. He served his pretrial detention at  the Federal Metropolitan Correctional Center, Chicago, Illinois -- 12/20/96=12/10/2001.  He entered the Federal Correctional Institution in Cumberland (FCI Cumberland), Maryland, on December 10, 2001 and has remained there to date.

**Prison Adjustment**

Research on life-sentenced inmates shows an overall pattern of adjustment among the vast majority of these prisoners that is marked by low rates of rule violations and improved adjustment over the course of their confinement.[5]  These findings apply to those whose term-of-years sentence amounts to a virtual life sentence, as is the case for Mr. Jackson. Many lifers struggle for years to adapt, committing rule violations and sometimes crimes for years before they come grudgingly to accept the fact that prison is their likely home for life. Once this recognition takes hold, lifers try to make the most of their lives in prison, avoiding misbehavior and seeking out constructive things to do to give their lives meaning.[6]

Mr. Jackson's constructive adjustment to his life sentence follows the general pattern of lifers but is unique in my experience. I have studied prison adjustment for some five decades now and can say with confidence that Mr. Jackson's prison adjustment is in a class by itself. I, for one, have never encountered a better adjusted inmate in my case work or research. Remarkably, Mr. Jackson has been a law-abiding and constructive citizen of the prison community from the very first day he set foot in FCI Cumberland some 20 years ago.

Also remarkable is the fact that Mr. Jackson has been neither charged nor convicted of a single rule violation during his 20 years in prison, an achievement that stands out as simply incredible in a world in which one is under near-constant surveillance for days and years and even decades on end.  Mr. Jackson is a former police officer. Note that ex-police officers are almost certain to be watched especially

---

[5] The extensive research support for this assertion is reviewed in Herbert (2018) and Leigey (2015).
[6] See Johnson & Dobrzanska, 2005; Johnson & McGunigall-Smith, 2008; Toch, 2010; Liem (2016); Leigey, 2015; Johnson, 2017.

closely by the authorities, if for no other reason than to afford them protection from predatory inmates who hold an animus against cops. This enhanced level of scrutiny makes Mr. Jackson's clean prison record all the more impressive.

Moreover, from the outset of his prison confinement, Mr. Jackson made clear in his interview, he was committed to "doing the right thing" and living a constructive life behind bars. (This stands in sharp contrast to most lifers, who arrive angry, resentful, and sometimes violent).[7] To achieve his laudable ends of doing right and living constructively, Mr. Jackson has maintained an impressive record of work evaluations in which his on-the-job ratings are high, often in the excellent category. Moreover, he has continually sought out courses and programs that would allow him to better himself and, in some instances, to gain the certification necessary to offer courses to other prisoners that would help them better themselves. Mr. Jackson has in fact offered a host of courses at the prison, an impressive achievement in its own right. In addition to personally offering or assisting in the presentation of a host of programs, Mr. Jackson has worked hard to informally mentor younger inmates who were struggling to adjust to prison and set their lives on a constructive course. Much of this behavior is guided by his religious commitment, which undergirds much of Mr. Jackson's prosocial behavior.

Judging by his record of prison adjustment, Mr. Jackson has taken a mature approach to his life in confinement. His mature coping efforts are affirmed in the results of three survey instruments administered during my interview with Mr. Jackson: The Brief Carver Cope Survey, the Coping Competence Questionnaire, and Coping Self-Efficacy Scale.[8] These instruments are heuristic devices that help me to describe Mr. Jackson's adjustment dynamics, which can then be assessed by reference to the body of scholarship on prison life and adjustment.

**Mature Coping Measures: Brief Carver Cope Survey (BCCS)[9]**

Mr. Jackson was administered the Brief Carver Cope Survey (BCCS), a paper-and-pencil instrument that measures coping skills and is highly correlated with the notion of mature coping, a concept developed in my work on prison adjustment dating back to 1987.[10] As I have noted in each of the four editions of my book, *Hard Time,* mature coping means: "(1) dealing directly with one's problems, using the resources legitimately at one's disposal; (2) refusing to employ deceit or violence other than in

---

[7] Johnson & Leigey (2020).
[8] These survey instruments are available upon request.
[9] Carver, 1997.
[10] Johnson, Rocheleau, & Martin, 2017: 18.

self-defense; and (3) building mutual and supportive relationships with others."[11] Furthermore, research on mature coping has established the following: "Inmates who cope maturely come to grips with problems in prison living, and they do so without violating the rights of others to be safe in their person and in their property. More generally, they treat others, staff and inmates alike, as fellow human beings who are possessed of dignity and worth. These inmates are the solid citizens of the prison community."[12]

Mr. Jackson's scores on the BCCS are presented in Figure One along with concise definitions of the 14 dimensions comprising the instrument. There is no cumulative score for this survey, and hence there are no baselines. Each test must be interpreted in relation to the distribution of the 14 dimensions of the scale and the ways these dimensions, individually and as a whole, relate to the lives of the persons under study.

FIGURE ONE
Brief Carver Cope Survey Scores
Edward Jackson (EJ)

| **DIMENSIONS** | **EJ SCORE** |
|---|---|
| **active coping**<br>(dealing directly and constructively with problems) | **EJ: 8/8** |
| **planning**<br>(marshaling personal resources to better deal with problems) | **EJ: 8/8** |
| **religion**<br>(finding solace in faith) | **EJ: 8/8** |
| **acceptance**<br>(living with matters that can't be changed) | **EJ: 7/8** |
| **emotional support**<br>(relying on others for understanding and sympathy) | **EJ: 7/8** |
| **self-distraction**<br>(using mental activities to keep from considering or addressing problems) | **EJ: 6/8** |
| **positive reframing**<br>(finding new and positive ways to think about problems), | **EJ: 5/8** |
| **venting**<br>(releasing feelings personal relief, e.g., verbalizing frustrations) | **EJ: 4/8** |

---

[11] ibid
[12] ibid

**self-blame**                                                          **EJ: 4/8**
(self-criticism for failures)

**instrumental support**                                                **EJ: 3/8**
(relying on others for assistance, advice or information)

**humor**                                                               **EJ: 2/8**
(finding escape through laughter, ability to laugh at
the predicament)

**substance use**                                                       **EJ: 2/8**
(turning to alcohol or drugs when stressed)

**denial**                                                              **EJ: 2/8**
(unwillingness to see problems as real or pressing)

**behavioral disengagement**                                            **EJ: 2/8**
(giving up on the problem)

The key finding for Mr. Jackson is that his scores are consistent with the tenets of mature coping and with his positive behavioral record over the past 20 years in prison. Mr. Jackson scored high (8/8) on active coping (dealing directly and constructively with problems), planning (marshaling personal resources to better deal with problems), and religion (finding solace in faith), which together capture his active, careful, faith-imbued life (many of his programs and courses, and much of his mentoring activity, relate to faith). Mr. Jackson also scored high (7/8) on acceptance (living with matters that can't be changed), which reflects a stoical acceptance of limits in life; and emotional support (relying on others for understanding and sympathy), which is a key element of mature relations with others. High scores on these dimensions together reflect a commitment to dealing directly and responsibly with problems, the core considerations reflected in the notion of mature coping.

The BCCS instrument does not provide explicit guidelines for which specific approaches to coping are best, instead advising a nuanced interpretation of how the various coping strategies come together for a given individual. The survey does include a list of several strategies seen as generally most healthy—active coping, positive reframing, planning, and acceptance. Use of emotional and instrumental support are also noted as generally positive strategies. Religion typically promotes prosocial behavior, and certainly does so in Mr. Jackson's life. Mr. Jackson scored high on many of these typically positive coping strategies with the exception of positive reframing (finding new and positive ways to think about problems), for which his score was above the mean but not high; and instrumental support (relying on others for assistance, advice, or information), for which he score was low, reflecting in his case a strong element of conscious self-

reliance in the face of problems. My reading of these scores, as a whole, is that Mr. Jackson copes in direct and positive ways as the expression of his belief in himself and God. That said, he has no illusions about the personal hardships entailed in his prison sentence, and the hard fact that he must ultimately rely on himself to solve daily problems in living rather than relying on God or on others in the prison community.

It is to Mr. Jackson's credit that he scored low on the strategies that are generally destructive and immature, such as substance use (turning to alcohol or drugs when stressed), disengagement (giving up on the problem), and denial (unwillingness to see problems as real or pressing). Mr. Jackson also scored low on humor (finding escape through the ability to laugh at one's predicament), which is unremarkable—and is neither positive nor negative coping attribute, given the sentence he faces.

Taken as a whole, Mr. Jackson BCCS profile is one that is high on most constructive avenues of adjustment and low on all destructive avenues of adjustment. This profile is consistent with his constructive prison adjustment and adds weight to the notion that his positive prison adjustment is the result of active decisions to take charge of his life behind bars and to adapt maturely to the pressures of prison living.

### Mature Coping Measures: Coping Competence Questionnaire (CCQ)[13]

Mr. Jackson was administered the Coping Competence Questionnaire (CCQ). This instrument is designed to measure self-efficacy, which in turns predicts resilience in the face of objectively daunting circumstances that might readily promote learned helplessness and defeat as expressed in situational depression. There are cumulative scores for this survey and hence there are baselines. Mr. Jackson's score on this instrument was perfect (72/72), much higher than the average (i.e. baseline) for this instrument (49/72). A high coping competence score is consistently correlated with high self-efficacy and hence resilience, which is the ability to bounce back from negative events as a result of one's belief in oneself. Mr. Jackson's scores indicate that he has great confidence in himself and is highly resilient in the face of the considerable pressures under which he lives as a person serving a life sentence. The key finding her is that Mr. Jackson is supremely confident that he can navigate the hurdles of prison life on his own.

### Mature Coping Measures: Coping Self-Efficacy Scale (CSES)[14]

Mr. Jackson was administered the Coping Self-Efficacy Scale (CSES) to get a second measure of self-efficacy and related resilience in the face of stress. This instrument, similar to the CCQ, is scored cumulatively and has baselines to help interpret individual scores. Like the CCQ, the CSES is designed to

---

[13] Schroder & Ollis (2013).
[14] Chesney et. al. (2006).

measure the capacity to successfully use healthy coping skills when life is extremely difficult. Mr. Jackson score on this instrument was perfect (260/260), well above the average for this instrument (165/260). A high coping self-efficacy score, like a high coping competence score, is consistently correlated with confidence in one's ability to use healthy coping strategies to navigate and overcome life's challenges. Mr. Jackson's scores on the CCQ and CSES instruments indicate that he perceives himself to be highly self-efficacious when it comes to using positive coping strategies to manage challenges in his life. His record of successful and constructive adjustment to prison bears out the findings reported in these instruments.

The three measures of coping used with Mr. Jackson are highly correlated. Those who are highly self-confident tent to cope well and be resilient under pressure; those who cope well tend to have confidence in themselves and in their ability to meet challenges and bounce back from setbacks. Resilient prisoners manage their prison lives and grow as human beings in the face of adversity rather than rely on rote conformity to the prison routine and the static life that portends. One can imagine that a person could readily be defeated and demoralized by a life sentence, at least at the outset, before one finds ways to adjust effectively. This was not the case for Mr. Jackson. One can also imagine simply going along with the prison routine and living the carceral version of a life of quiet desperation. This was not the case for Mr. Jackson. Instead, Mr. Jackson has risen to the challenge of a life sentence and adapted well from the outset of his confinement, carving out a life for himself behind bars that he can be proud of. His resilience and associated growth as a person augur well for his reentry, which requires the adaptability he has shown. Note that prisoners who adapt passively, following rules and routines, are much more likely to fail at reentry than are resilient prisoners. Thus, success on parole for lifers is the result of "a strong sense of self-efficacy" expressed in well-managed prison lives rather than merely good prison behavior that is achieved as a matter of conformity.[15] Self-efficacy, in turn, promotes active problem solving and thoughtful planning for a good life, additional elements of adjustment that are associated with successful reentry and can be readily found in Mr. Jackson's prison adjustment.[16.]

**Age, Adjustment, and Recidivism Risk**

Mr. Jackson is 51 years old. There is a "criminological consensus" based on an extensive body of research that age 50 is the point at which "recidivism in all crime categories plummets."[17] As noted in one

---

[15] Liem & Garcin (2014)
[16] As seen in the desistance research, "one's self efficacy or personal control… and/or purposeful, intentional action… may be key facilitators of behavioral change… [Moreover] Desistance may be more common among former offenders who had a commitment to change along with a plan for doing so… (Bersani & Doherty, 2018:320).
[17] Johnson 2017: 65.

research review of the literature on age and crime, "there is the persistence [in research findings] of the brute fact that age has a direct effect on behavior," in this instance significantly reducing the risk of crime.[18] Unsurprisingly, Mr. Jackson's overall record is indicative of a low risk of recidivism as reflected in the risk assessment tool developed under the First Step Act Risk Assessment Tool Risk Assessment Tool (urban.org).[19] Note that Mr. Jackson's record of infraction- and crime-free behavior for some 20 years reduces this risk to that of a citizen with no criminal record at all. Surely one compelling way to say that a person is rehabilitated is to affirm that his or her risk of crime has been reduced to that of person with no criminal record. No one can put an exact number on this risk, but the term "negligible" captures the meaning of this finding.

**Desistance and Social Support**

In addition to mature coping and aging, Mr. Jackson has the benefits of strong social support if he were to be released.  (This can be readily seen in the many letters of support entered into Mr. Jackson's file.) Social support is critical, both in terms of offering allies to buffer the shock of reentry but also in terms of solidifying prosocial identities and affording social capital needed to reconnect with the society and live decently upon release.[20]

**Summary and Conclusion**

Mr. Jackson is an excellent candidate for release from prison at this time. He has shown the will and capacity to live a constructive and non-criminal life in prison, his home for the last 20 years.  During those long years, the span of a generation, he has been a law-abiding, productive, and socially responsible member of the prison community. Rehabilitated inmates like Mr. Jackson are ideal candidates for release from prison, especially when they have served sentences long enough to satisfy reasonable concerns for deterrence and retribution, as is the case for Mr. Jackson.

By the standards of the corrections field, Mr. Jackson is rehabilitated. Mr. Jackson's risk of returning to crime is negligible, indeed, likely no greater than the risk of committing a crime shown by

---

[18] Bersani & Doherty, 2018:324
[19] SURVEY RESULTS, EDWARD JACKSON: "To be eligible for early release, the general risk score must be less than 31 and the violent risk score must be less than 25. **General**: -10 (Minimum); **Violent**: -1 (Minimum). Based on these results, this person would be eligible for early release."

[20]  Bersani & Doherty, 2018:321

someone who has led a crime-free life.  By any reckoning, Mr. Jackson is a new man today. That man is a solid citizen of the prison world. When released, it is reasonable to conclude that he will be a solid citizen of the free world as well.

## References

Bersani, Bianca E. & Doherty, Elaine Eggleston, Desistance from Offending in the Twenty-First Century (*Annual Review of Criminology*, 2018: 1:311-34)

Carver, C. S. (1997). You want to measure coping but your protocol's too long: Consider the Brief COPE. *International Journal of Behavioral Medicine*, 4, 92-100.

Chesney MA, Neilands TB, Chambers DB, Taylor JM, & Folkman S. A validity and reliability study of the coping self-efficacy scale. Br J Health Psychol 2006 Sep; 11(3): 421-37. (http://www.pubmedcentral.nih.gov/articlerender.fcgi?artid=1602207)

Haney, Craig (2009). *The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful*, Prison Service Journal, 12 (2009);

Herbert, Steve (2018). *Too Easy to Keep: Life-Sentenced Prisoners and the Future of Mass Incarceration*. University of California Press.

Johnson, Robert (2017). Murder Most Human: A Case for a Categorical Ban of Life-Without-Parole Sentences for All Juvenile Offenders with Guidelines for Release Decisions for Former Juvenile Life-Without-Parole Cases, *Journal of Criminal Justice and Law* 1 (1) Jan 2017: 57-66.

Johnson, Robert & Leigey, Margaret (2020). The Life-Course of Juvenile Lifers: Understanding Maturation and Development as Miller and Its Progeny Guide Juvenile Life Sentence Release Decisions, *Journal of Criminal Justice and Law: Official Journal of the Law and Public Policy Section of the Academy of Criminal Justice Sciences* 3 (2) 29-46.

Johnson, Robert; Rocheleau, Ann Marie; & Martin, Alison B. (2017). *Hard Time: A Fresh Look at Understanding and Reforming the Prison*, (4th ed.) Wiley-Blackwell, 2017.

Johnson, Robert & Dobrzanska, Ania (2005). Mature Coping Among Life-Sentence Prisoners: An Exploratory Study of Adjustment Dynamics, *Corrections Compendium* 30 (6) (Nov-Dec) 2005: 8-9 & 36-38.

Johnson, Robert & McGunigall-Smith, Sandra (2008). Life Without Parole, America's Other Death Penalty: Notes on Life under Sentence of Death by Incarceration, *The Prison Journal* 88 (2) June, 2008: 328-34.

Kupers, Terry Allen (2017). *Solitary: The Inside Story of Supermax Isolation and How we can Abolish It*. University of California Press.

Leigey, Margaret (2015). *The Forgotten Men: Serving a Life Without Parole Sentence*. Rutgers University Press.

Liem, Marieke (2016). *After Life Imprisonment: Reentry in the Era of Mass Incarceration*. New York University Press.

Liem, Marieke & Garcin, Jennifer. Post- Release Success among Paroled Lifers, 3 LAWS 798, 817 (2014).

Schroder, Kerstin E. E. & Ollis, C. L. (2013). The Coping Competence Questionnaire: A measure of resilience to helplessness and depression. *Motivation and Depression* June 37 (2) 286-302.

Toch, Hans (2010). "I am not now who I used to be then": Risk Assessment and the Maturation of Long-Term Prisoners, *The Prison Journal* 90 (1) 4-11.

Tolman, E; Cochran J. C.; Cochran, J. K. (2018). Jailhouse Blues? The Adverse Effects of Pretrial Detention for Prison Social Order, *Criminal Justice and Behavior* 45: 316-339.

EXHIBIT C

Dear Judge Tharp,

My Name is Lena Jackson, I am Edward Jackson's sister.  I am writing this letter to ask you to please give my brother Edward a fair sentence.

My brother is a very good and kind person.  Edward is the type of person who gives them his last.  He always took the time out to make sure they the seniors in our neighborhood, and the children who were less fortunate.  This is also a quality that Edward shared with family and others.

There was a time when I lost my job and children's father had left the kids and me around Christmas time.  Because of this l could not pay my full rent and let long provide Christmas for the children. Without telling Edward the anything he was at my door saying that he was taking us Christmas shopping.  As we were shopping I begun telling Edward how because the kid's father leaving I did not have all my rent. Edward looked at me smiling as I cried and said "Lil Lena I got you girl, you don't even have to worry because the kids and you are going to be alright as long as you need me".  And from that day forward Edward took the roll of uncle/father figure in the kids' lives.  Edward would always shop for my children when shopping for his own.  He always made sure that there was never a dull moment and made me feel special.

Edward taught me how to give, with never looking for something in return and that giving is the reward ever.  My brother never wanted to see anyone going hungry or without.  He would pull over and give them the shirt off his back if that is what they needed.  So often in my daily life I have managed to live my life from with the things that my brother instilled in me.  Edward coached me in my younger years and it shows in the way that I have raised my children.  I often pray that one day Edward would be free and I play it in my head on how proud Edward would be our siblings and myself on how we all turned out to be great loving people.  We all have carry on his legacy of giving back to the homeless and less fortunate.  I would like to thank you Judge Tharp for your time.

Thank you,


Lena Jackson

Feb 14, 2021

Dear Judge Tharp,

My name is Herbert Thornton and I am a friend of Edward Jackson. I've known Edward Jackson for 15 years. I met Edward in 2006 in Cumberland, Maryland FCI.

I remember my first encounter with him when he invited me to a bible study he was conducting. During this time I immediately recognized his love for God, and by his interaction with the other inmates I saw his compassion towards them. Edward had a constant burden and concern for the needs of others. He organized essential need care packages for new members of the bible study and he instructed a workout class for inmates. Together we would often pray for families that lost their loved ones.

I know Edward to be kind, respectful and encouraging others to be positive as he himself always strived to be. He always had a high level of respect for authority. I will always remember him telling me to "practice humility" and each day I live my goal is to do just that. Edward has played a significant role on my journey to renewing my mind in Christ. I believe because of this I am a better and more productive member of society. Edward and I continue to stay in touch.

In closing I'm humbly asking for compassion to be shown towards Edward Jackson. His compassion and mercy I've seen him display towards myself and others reveal the new man in Christ he now is, not just in word, but in deed, character and by a transformed life.

Humbly Submitted,
Herbert Thornton

Jackson N. Phadah

[REDACTED]

02/23/2021

Gabrielle Hillman
55 E. Monroe St. Ste. 2800
Chicago, Illinois 60603


I am writing this letter about Edward Lee Jackson Jr.

I am his first and only son Jackson Phadah and I have known him for 29 years. Of the 29 years, I only spent 5 years with him in my life. From everything that I remember he was a good father and loved my mother. He provided everything that we needed and he introduced me to the world of comics, sports, and video games. The memory that I remember the most was when NBA Kevin Garnett came to our home and ate my Captain Crunch cereal.

My father Edward Jackson Jr. embraced family and would never do anything to jeopardize it. Despite only having spent 5 years with my father, I have learned core and valuable lessons about the world and life in the time we spent separated through letters, emails, and phone calls. Edward Lee Jackson Jr. is a man of integrity, resilience, perception, and respect.

Sincerely,

Jackson N. Phadah

Dear: Honorable Judge Tharp,

      I'm writing this letter to you knowing you are a man who uphold the law to the fullest. I know that you are a honorable man, and treat all men equally, and for that I would like to say thank you. Mr. Edward Jackson has been serving time for a unlawful choice he was found guilty of making. Everyone should face a punishment for unlawful choices, however Mr. Jackson was sentenced, and shipped so far away like a animal, to ensure his family could not visit him. Mr. Jackson, and his family did the time, and now all we're asking is, if we can be reunited with him. Mr. Jackson didn't take a life, so my questioned why is his life being taken. We have seen many cases similar to, and worse than Mr. Edward Jackson. The offenders were   sentenced accordingly, and their families knew that in a few years they would see them. I'm just asking you to look at Mr. Edward L Jackson case before you. As a man, former officers of the law. Who showed so much love for others. , look at the time he's served, and see , if a human should still be cage like a animal for the crime at hand. I'm asking you your honor can we spend some of our lifetime together here on earth with Mr. Edward L Jackson? We're facing times now where enough family members have died while Mr. Edward L Jackson has been incarcerated. With all do respect will you allow our family to deal with this fearful pandemic which is taking lives rapidly without worrying about him dying while incarcerated, or worse any more family members dying. I will never know the person who was charged, because I only knew the person who loved, supported, gave, fed, cloth, helped in any way he was aware of a need of anyone. He cared for his family with his heart and soul. Mr. Edward L, Jackson made the family proud with his choice of profession as a Chicago police officer. Mr. Edward L Jackson had overcome his pain. I'm praying now, as I have been for the 25 years, that Mr. Edward L Jackson have been incarcerated. Mr. Edward L Jackson had a lot of family unfortunate on his mind, and heart each day of his life. Mr. Jackson siblings were in the system being abused, at the hands of law-abiding citizens. Mr. Edward L, Jackson mother made choices for his life, and he chose to overcome them. Our family was thinking the police force would free him from the heaviness in his heart. Mr. Jackson was a child of a broken system. Mr. Jackson was born to a drug addicted mother, father. Our family had so much hope, and gratitude for the police forces for giving him hope, and something to live for. Mr. Edward L Jackson has be reformed, and can return back into society, and be a great access to many. Mr. Jackson can relate to so many others pain and give them a since of hope, telling them not to give up on their dreams, and he would pray for them. Mr. Jackson is still putting others before himself. He prays with me for anything I inform him of, he prays for my strength, because he knows I'm trying to keep the family together.  It was him and I who always believed God was going to make a way for us and our family to always be able to be a blessing to other's. I would worry about his well-being then I would receive scriptures from him to lift my spirit up, because he knows how much family wanted to see him. He would text me scriptures which give me hope now that he can use the computer. I can't believe his strength, concern, and will to care for others even in his current situation. Mr. Jackson has and have always had a heart filled with love for anyone. I use to call him a super cop, always ready willing , and faithful to serving, and protecting others. Thank you, your honor, for allowing me to share with you who Mr. Edward lee Jackson really is.

      Sincerely his big cousin,

          Mrs. Karen D Ward.

Dear Judge Tharp

On December 20, 1996 my brother Edwward Lee Jackson Jr was taken into custody. My brother was my mentor, and he believed in me.  He help nurture me into being a responsible young man. In 1994 my brother gave me my first job at My Place beauty salon. I was just released from Crossroads work release center. That motivaed me to become a better person and kept me out of trouble. My brother coached and molded me to stay focused and He believed in me when I sometimes didnt believe in myself.  My brother Edward was determine for me not to let my past become  my present.

Since the day  he was taken away and incarrirated from myself and my other sibilings, because of the love and leadershiphe instilled in me I never looked back. I was determine to stay on the correct path and not focus on what I been through in my past. I talked to my brother on a regular basis. A year after him being incarirated I found a new job as a cook on the spirit of Chicago along with my sister Lena Jackson.

My brother has always been a loving , passionate person, He loved to see us all happy. He believed in what was right. Judge Tharp Im asking that you plese give my brother a fair sentencing. I constantly pray daily that one day that we will be reunited as a family again.

Thank you fo your time and patience ,

Clarence Yarbar

March 22, 2021


Dear Judge Tharpe,


My name is Jenise Lathon and I'm writing on behalf of Edward L. Jackson. Edward Jackson, was a friend of my now deceased brother, Thomas Bolden. They met at Lane Technical High School in 1983. They became friends in High School and continued into adulthood. After high school my brother went to the Air Force and Ed (what we called him), joined the Chicago Police Department.

We were very Proud and excited for him. He worked in the 15th District, which is where my boyfriend, who would later become my husband, lived. I would often see him on patrol as a uniformed officer. It was by this time that he was more like my little brother than just a family friend. He moved up the ranks and soon became a Vice officer.

A once safe and family oriented area, soon became crime ridden due to the drug surge of the late 80's and early 90's. He was known as a no nonsense cop and even though the guys who were on the wrong side of the law didn't like when the police showed up, they respected him when he came up.

When my brother finished his term in the Air Force, he came back to Chicago. He and Ed, became roommates. My brother was the like a Godfather to his son, who we called Tank. Ed was very generous to myself and my mom. If we needed anything we could always count on him, be it a ride or financial, all we had to do was ask!

My mom considered him her bonus son! When my brother got a job working for The Chicago Transit Authority, he moved into his own apartment, but they still were close and hung out whenever their schedules allowed. Ed would come to our house for Sunday dinners and we would go out to the movies and The Country Buffet on many occasions.

When Ed was arrested we were baffled and Heartbroken! Our belief in his innocence never wavered. My brother became seriously ill in 1999 and as Ed was fighting his case, he would make visits to see him after his dialysis treatments.

When he received such a harsh sentence my mom's heart was broken! My Brother died in January of 2001 and Ed was devastated. Although he was in jail, he always called my mom and sent her Mother's day and Birthday cards each year.

My mom was diagnosed with lung cancer in 2019 and lost her battle on June 5, 2020. Her and Ed kept in touch regularly and she kept in touch with his dad who lived in Ohio. Ed was totally devastated when he learned that our mom had passed. He would text my sister and I to check up on us and to just offer kind words and reminisce about her. She really believed that she would get to see him again!

We recently learned that Ed's father passed away as well! My heart broke because so many of those close and near to him have died. He is a strong person, but I can only imagine the pain he feels not being able to be here to see them and touch them.

I totally understand that there were serious charges he was convicted of, but I am writing this letter to ask if you can find compassion in considering his release. I believe he has paid his debt to society for his crime and has learned a serious lesson as well.


Sincerely,


Jenise S. Lathon

EXHIBIT D



## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: JACKSON, EDWARD LEE JR  07546-424

SEQUENCE: 00257185
Report Date: 08-13-2021



| | | | | |
|---|---|---|---|---|
| Facility: | CUM CUMBERLAND FCI | | Custody Level: | IN |
| Name: | JACKSON, EDWARD LEE JR | | Security Level: | MEDIUM |
| Register No.: | 07546-424 | | Proj. Rel Date: | 12-18-2094 |
| Quarters: | C07-216L | | Release Method: | GCT REL |
| Age: | 51 | | DNA Status: | CUM03617 / 05-26-2011 |
| Date of Birth: | | | | |

## Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| 18:1951 & 1962(C) & (D) RACKETEERING/EXTORTION ACTIVITIES (CTS 1, 2, 3, 7, 14, 15, 24 & 28) | 240 MONTHS |
| 21:841(A)(1) & 846 CONSPIRACY AND ATTEMPT TO DISTRIBUTE COCAINE (CTS 25 & 26) | 120 MONTHS |
| 18:924(C) POSSESSION OF A FIREARM IN RELATION TO A CRIME OF VIOLENCE (CT 4) | 60 MONTHS |
| 18:924(C) POSSESSION OF A FIREARM IN RELATION TO A CRIME OF VIOLENCE (CTS 8, 16, 27, 29) | 960 MONTHS |

Date Sentence Computation Began:    10-18-2001
Sentencing District:    ILLINOIS, NORTHERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit  - InOp Time |
|---|---|---|---|
| 0 /    0 /    0 | 1,296 | Years: 24 Months: 7 Days: | + 1763    JC - 0    InOp |
| | | Time Served | |

## Detainers

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

## Program Plans

Inmate Jackson has been confined at FCI Cumberland, Maryland, since December 10, 2001.

## Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| CUM | F REC AM | FCI RECREATION 7:30 - 4:00 PM | 08-08-2017 |

## Work Assignment Summary

Inmate Jackson has worked in the Recreation Department and has served as Recreation's lead orderly (Pay Grade 1), and instructed Wellness classes in the gymnasium since before 2013.  He is, and has been our Lead Instructor during that period, besides while on the national modified operations due to COVID.

## Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| CUM | ESL HAS | ENGLISH PROFICIENT | 01-07-2002 |
| CUM | GED HAS | COMPLETED GED OR HS DIPLOMA | 12-13-2001 |

## Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| CUM | C | ANCIENT CIVILIZATION | 02-08-2016 | 04-18-2016 |
| CUM | C | ANCIENT VS MODERN LANGUAGE | 09-24-2015 | 12-03-2015 |
| CUM | C | INTERNATIONAL TRADE | 09-23-2015 | 12-02-2015 |
| CUM | C | LEGENDARY HISTORY | 02-14-2015 | 04-04-2015 |
| CUM | C | LEGENDARY HISTORY | 09-29-2014 | 12-08-2014 |
| CUM | C | IRONMAN I | 12-11-2014 | 12-11-2014 |
| CUM | C | INTENSE CALISTHENICS I | 12-11-2014 | 12-11-2014 |
| CUM | C | ABS I | 12-11-2014 | 12-11-2014 |
| CUM | C | INTENSE CALISTHENICS I | 12-11-2014 | 12-11-2014 |
| CUM | C | LEGENDARY HISTORY | 05-24-2014 | 07-26-2014 |



**Summary Reentry Plan - Progress Report**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: JACKSON, EDWARD LEE JR   07546-424

SEQUENCE: 00257185
Report Date: 08-13-2021

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| CUM | C | LEGENDARY HISTORY | 01-29-2014 | 04-05-2014 |
| CUM | C | INTRODUCTION TO HEBREW | 01-28-2014 | 04-03-2014 |
| CUM | C | LEGENDARY HISTORY | 09-21-2013 | 11-23-2013 |
| CUM | C | LEGENDARY HISTORY | 05-16-2013 | 07-03-2013 |
| CUM | C | LEGENDARY HISTORY | 01-15-2013 | 03-19-2013 |
| CUM | C | LEGENDARY HISTORY | 09-10-2012 | 11-26-2012 |
| CUM | C | LEGENDS OF ANCIENTS | 11-29-2011 | 02-21-2012 |
| CUM | C | INTRODUCTION TO HEBREW | 11-28-2011 | 01-30-2012 |
| CUM | C | INTRODUCTION TO HEBREW | 08-21-2010 | 10-16-2010 |
| CUM | C | MRSA IN AN ATHLETIC FACILITY | 10-12-2010 | 10-12-2010 |
| CUM | C | INTRODUCTION TO HEBREW | 03-16-2010 | 05-27-2010 |
| CUM | C | PART 2 OF NURSING ASST CLASS | 12-01-2009 | 05-20-2010 |
| CUM | C | INTRODUCTION TO HEBREW | 05-04-2009 | 07-08-2009 |
| CUM | C | NURSING ASSISTANT CLASS | 03-03-2009 | 06-24-2009 |
| CUM | C | AFRICAN CIVILIZATION | 01-12-2009 | 03-11-2009 |
| CUM | C | HISTORY OF THE MIDDLE EAST | 01-13-2009 | 03-12-2009 |
| CUM | C | BASIC THEOLOGY | 07-02-2008 | 10-03-2008 |
| CUM | C | INTRODUCTION TO HEBREW | 08-26-2008 | 11-04-2008 |
| CUM | C | WEEKEND ABS 2 | 11-18-2007 | 11-18-2007 |
| CUM | C | ABS 1 - WHEEL | 09-11-2007 | 10-31-2007 |
| CUM | C | MRSA CLASS | 09-24-2007 | 10-17-2007 |
| CUM | C | WEEKEND ABS MASTER | 06-06-2007 | 07-14-2007 |
| CUM | C | ABS 3 | 06-06-2007 | 08-30-2007 |
| CUM | C | ADVANCED AEROBICS 1 | 03-13-2007 | 05-04-2007 |
| CUM | C | ADVANCED ABS 1 | 03-13-2007 | 04-26-2007 |
| CUM | C | CALITB | 01-08-2007 | 02-26-2007 |
| CUM | C | SPORTS NUTRITION | 12-06-2006 | 02-09-2007 |
| CUM | C | MENS HEALTH | 10-01-2006 | 11-20-2006 |
| CUM | C | PERSONAL TRAINER CLASS (NFPT) | 01-12-2006 | 03-27-2006 |
| CUM | C | BEGINNER ANATOMY CLASS | 02-08-2006 | 03-03-2006 |
| CUM | C | F HEPIABC | 01-18-2006 | 02-09-2006 |
| CUM | C | STRESS MANAGEMENT | 01-10-2006 | 02-08-2006 |
| CUM | C | AIDS 101 | 01-12-2006 | 01-30-2006 |
| CUM | C | NUTRITION | 01-07-2006 | 01-28-2006 |
| CUM | C | BASIC ANATOMY CLASS | 01-23-2006 | 01-26-2006 |
| CUM | C | BRAVE FACILITATORS PM CLASS | 08-18-2004 | 12-28-2005 |
| CUM | C | EXTREME CALISTHENICS-BEG. | 11-15-2005 | 12-23-2005 |
| CUM | C | CALISTHENICS AM-BEGINNER | 07-18-2005 | 09-16-2005 |
| CUM | C | ABS 1 | 03-29-2005 | 05-30-2005 |
| CUM | C | JUMPING 1 | 11-10-2004 | 12-17-2004 |
| CUM | C | BIKING OVER 40-INTERMEDIATE | 11-12-2004 | 12-17-2004 |
| CUM | C | WEEKEND AEROBICS-ADVANCED | 07-16-2004 | 08-30-2004 |
| CUM | C | BIKE PM | 05-07-2004 | 06-23-2004 |
| CUM | C | AEROBICS PM | 05-06-2004 | 06-23-2004 |
| CUM | C | AEROBICS PM | 05-06-2004 | 05-06-2004 |
| CUM | C | WEEKEND AEROBICS 2 | 11-12-2003 | 12-29-2003 |
| CUM | C | HIP HOP 1 | 11-14-2003 | 12-29-2003 |
| CUM | C | STRETCHING 2 | 11-14-2003 | 12-29-2003 |
| CUM | C | WEEKEND AEROBICS 1 | 07-30-2003 | 10-20-2003 |
| CUM | C | INTERMEDIATE YOGA | 06-18-2003 | 08-12-2003 |
| CUM | C | HEALTHY AGING-OVER 40 | 06-24-2003 | 08-12-2003 |
| CUM | C | IRONMAN 2 | 11-23-2002 | 12-20-2002 |
| CUM | C | HIP I | 09-20-2002 | 11-01-2002 |
| CUM | C | BBIKE I | 09-20-2002 | 11-01-2002 |
| CUM | C | IRONMAN | 09-20-2002 | 11-01-2002 |
| CUM | C | AEROBIC | 09-20-2002 | 11-01-2002 |
| CUM | C | AEROBIC I | 07-19-2002 | 09-02-2002 |



## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: JACKSON, EDWARD LEE JR  07546-424

SEQUENCE: 00257185
Report Date: 08-13-2021

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| CUM | C | HIP I | 07-19-2002 | 09-02-2002 |
| CUM | C | BEYOGA | 07-20-2002 | 09-02-2002 |
| CUM | C | ABSB I | 07-20-2002 | 09-02-2002 |
| CUM | C | ABSB I | 07-19-2002 | 07-19-2002 |
| CUM | C | CALI I | 05-09-2002 | 06-21-2002 |

### Education Information Summary

Inmate Jackson has completed 72 educational programs since his arrival at FCI Cumberland, and has instructed wellness classes in the gymnasium since before 2013, as the Lead Instructor.

### Discipline Reports

| Hearing Date | Prohibited Acts |
|--------------|-----------------|
| 11-08-2001 | 305 : POSSESSING UNAUTHORIZED ITEM |
| 04-13-2000 | 203 : THREATENING BODILY HARM |
| 12-17-1999 | 307 : REFUSING TO OBEY AN ORDER |
| 02-05-1999 | 307 : REFUSING TO OBEY AN ORDER |
| 10-07-1998 | 307 : REFUSING TO OBEY AN ORDER |
|  | 330 : BEING UNSANITARY OR UNTIDY |
| 07-23-1997 | 305 : POSSESSING UNAUTHORIZED ITEM |

### Discipline Summary

Inmate Jackson hasn't incurred any incident reports since November 6, 2001.

### ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|------|-----------|--------|-------|------|
| CUM | A-DES | OTHER AUTH ABSENCE RETURN | 08-08-2017 | CURRENT |
| CUM | A-DES | OTHER AUTH ABSENCE RETURN | 07-24-2017 | 08-08-2017 |
| CUM | A-DES | OTHER AUTH ABSENCE RETURN | 06-21-2017 | 07-24-2017 |
| CUM | A-DES | OTHER AUTH ABSENCE RETURN | 04-19-2017 | 06-21-2017 |
| CUM | A-DES | TRANSFER RECEIVED | 12-10-2001 | 04-19-2017 |

### Current Care Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 12-16-2004 |
| CARE1-MH | CARE1-MENTAL HEALTH | 10-25-2010 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 01-28-1997 |
| YES F/S | CLEARED FOR FOOD SERVICE | 02-07-2020 |

### Current PTP Assignments

| Assignment | Description | Start |
|------------|-------------|-------|

*NO ASSIGNMENTS*

### Current Drug Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| DRG I NONE | NO DRUG INTERVIEW REQUIRED | 01-03-2002 |

### Physical and Mental Health Summary

Inmate Jackson is assigned to Regular Duty Status with No Medical Restrictions.

### FRP Payment Plan

Most Recent Payment Plan



## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: JACKSON, EDWARD LEE JR  07546-424

SEQUENCE: 00257185
Report Date: 08-13-2021

| Most Recent Payment Plan |
|---|

| FRP Assignment: | PART | FINANC RESP-PARTICIPATES | Start: 06-13-2006 |
|---|---|---|---|

Inmate Decision: **AGREED** **$25.00** Frequency: **QUARTERLY**
Payments past 6 months: **$50.00** Obligation Balance: **$21,000.00**

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status | |
|---|---|---|---|---|---|---|
| 1 | ASSMT | $1,500.00 | $930.74 | IMMEDIATE | EXPIRED | |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | | |
| 2 | FINE | $25,000.00 | $21,000.00 | IMMEDIATE | AGREED | |

| | Adjustments: | Date Added | Facl | Adjust Type | Reason | Amount |
|---|---|---|---|---|---|---|
| | | 06-10-2021 | CUM | PAYMENT | INSIDE PMT | $25.00 |
| | | 03-10-2021 | CUM | PAYMENT | INSIDE PMT | $25.00 |

### Financial Responsibility Summary

Inmate Jackson is assigned to the Inmate Financial Responsibility Participates status.

### Release Planning

Inmate Jackson has a projected release date of December 18, 2094, via Good Conduct Time. He has a two year term of supervision with the Northern District of Illinois.

### General Comments

Inmate Jackson's Unit Team will review him for a residential reentry center placement when he is within 17-19 months from release.



## Summary Reentry Plan - Progress Report

**Dept. of Justice / Federal Bureau of Prisons**
Plan is for inmate: JACKSON, EDWARD LEE JR 07546-424

SEQUENCE: 00257185
Report Date: 08-13-2021

Name: JACKSON, EDWARD LEE JR
Register Num: 07546-424
Age: 51
Date of Birth: ▮▮▮▮▮▮▮
DNA Status: CUM03617 / 05-26-2011

Inmate   (JACKSON, EDWARD LEE JR, Register Num: 07546-424)

8-13-2021
Date

Chairperson
8-13-2021
Date

Case Manager
8-13-2021
Date

EXHIBIT E

**Table 6**

## SENTENCE LENGTH BY TYPE OF CRIME[1]
### 2nd Quarter 2021 Preliminary Cumulative Data (October 1, 2020, through March 31, 2021)

| TYPE OF CRIME | Mean Months | Median Months | N |
|---|---|---|---|
| **TOTAL** | 47 | 24 | 25,841 |
| **Administration of Justice** | 14 | 9 | 247 |
| **Antitrust** | 2 | 0 | 3 |
| **Arson** | 88 | 60 | 23 |
| **Assault** | 51 | 30 | 284 |
| **Bribery/Corruption** | 19 | 12 | 119 |
| **Burglary/Trespass** | 21 | 12 | 30 |
| **Child Pornography** | 109 | 90 | 528 |
| **Commercialized Vice** | 15 | 6 | 40 |
| **Drug Possession** | 1 | 0 | 139 |
| **Drug Trafficking** | 74 | 60 | 7,856 |
| **Environmental** | 2 | 0 | 77 |
| **Extortion/Racketeering** | 23 | 12 | 58 |
| **Firearms** | 48 | 37 | 3,665 |
| **Food and Drug** | 11 | 3 | 22 |
| **Forgery/Counter/Copyright** | 14 | 12 | 81 |
| **Fraud/Theft/Embezzlement** | 20 | 10 | 1,925 |
| **Immigration** | 12 | 8 | 7,946 |
| **Individual Rights** | 35 | 3 | 31 |
| **Kidnapping** | 154 | 125 | 38 |
| **Manslaughter** | 71 | 51 | 29 |
| **Money Laundering** | 62 | 36 | 423 |
| **Murder** | 220 | 198 | 99 |
| **National Defense** | 35 | 30 | 92 |
| **Obscenity/Other Sex Offenses** | 21 | 18 | 148 |
| **Prison Offenses** | 11 | 8 | 263 |
| **Robbery** | 106 | 95 | 598 |
| **Sexual Abuse** | 207 | 180 | 468 |
| **Stalking/Harassing** | 27 | 16 | 104 |
| **Tax** | 16 | 12 | 185 |
| **Other** | 2 | 0 | 320 |

[1] Sentences greater than 470 months (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. In addition, the information presented in this table includes conditions of confinement as described in USSG §5C1.1. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, Preliminary 2021 Datafile, USSCFY21 (October 1, 2020, through March 31, 2021).

EXHIBIT F



# Quick Facts

*— 18 U.S.C. § 924(c) Firearms Offenses —*

## Fiscal Year 2020

▶ IN FY 2020, 64,565 CASES WERE REPORTED TO THE U.S. SENTENCING COMMISSION.

▶ 2,525 INVOLVED CONVICTIONS UNDER 18 U.S.C. § 924(c).[1]

▶ OFFENSES UNDER 18 U.S.C. § 924(c) INVOLVE THE USE OR CARRYING OF A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME, OR THE POSSESSION OF A FIREARM IN FURTHERANCE OF THOSE CRIMES.



**Number of 18 U.S.C. § 924(c) Offenders**



**Mandatory Minimum Penalties for 18 U.S.C. § 924(c) Offenders[2]**

## Offender Characteristics and Sentencing

- 95.6% of section 924(c) offenders were men.

- 51.0% were Black, 23.4% were Hispanic, 22.8% were White, and 2.8% were Other races.

- Their average age was 33 years.

- 95.0% were United States citizens.

- 23.9% had little or no prior criminal history (Criminal History Category I);
  - 13.2% were CHC II;
  - 20.2% were CHC III;
  - 15.1% were CHC IV;
  - 9.1% were CHC V;
  - 18.5% were CHC VI.

- The top five districts for section 924(c) firearms offenders were:
  - District of Puerto Rico (200);
  - Eastern District of North Carolina (101);
  - Southern District of New York (100);
  - Western District of Missouri (94);
  - Eastern District of Missouri (82).

- 8.2% were career offenders (§4B1.1).

- 7.4% were convicted of multiple counts of section 924(c).

## Punishment

- All but one section 924(c) offender were sentenced to prison.[4]

- The average sentence was 138 months.

  - 77 months for offenders convicted only under section 924(c).

  - 137 months for offenders also convicted of an offense not carrying a mandatory minimum.

  - 199 months for offenders determined to be career offenders.

  - 245 months for offenders convicted of multiple counts of section 924(c).

This document was produced and published at U.S. taxpayer expense.
For more Quick Facts, visit https://www.ussc.gov/research/quick-facts.



www.ussc.gov
pubaffairs@ussc.gov
@theusscgov

*— 18 U.S.C. § 924(c) Firearms Offenses —*

## Punishment (continued)

- 86.8% of section 924(c) offenders were also convicted of another offense:
  - 58.1% for drug trafficking, 22.6% for robbery, and 8.1% for another firearms offense.

- 35.5% of all section 924(c) offenders were convicted of another offense carrying a mandatory minimum. In most cases, the other offense was a drug trafficking crime.

## Sentences Relative to the Guideline Range

### Section 924(c) Only Offenders

- 89.4% of offenders with a conviction only under section 924(c) were sentenced under the *Guidelines Manual;* 5 of those offenders:
  - 7.1% received a substantial assistance departure.
    - ◊ Their average sentence reduction was 60.2%.

### Section 924(c) Cases Involving Career Offender

- 42.8% of section 924(c) offenders determined to be career offenders were sentenced under the *Guidelines Manual;* of those offenders:
  - 45.5% received a substantial assistance departure.
    - ◊ Their average sentence reduction was 52.2%.

- 57.2% received a variance.
  - 97.1% received a downward variance.
    - ◊ Their average sentence reduction was 35.8%.

### All Section 924(c) Cases

- The average guideline minimum and average sentence imposed for all section 924(c) offenders decreased over the past five years.

  - The average guideline minimum decreased from 202 months in fiscal year 2016 to 186 months in fiscal year 2020.

  - The average sentence imposed decreased from 151 months in fiscal year 2016 to 138 months in fiscal year 2020.

**Distribution of 18 U.S.C. § 924(c) Offenders With and Without Additional Offenses**



**Sentence Relative to the Guideline Range (%)**





**Average Guideline Minimum and Average Sentence (months)**

---

1  Cases with incomplete sentencing information were excluded from the analysis. Cases that do not meet logical criteria were also excluded.
2  These values represent the highest mandatory minimum an offender was subject to under section 924(c).
3  The "Other" category includes offenders with a mandatory minimum of 25 years (0.6%), 30 years (0.1%), and life (0.2%).
4  Offenses under section 924(c) carry one of several mandatory minimum penalties depending on the circumstances of the offense.
5  The guideline sentence for a section 924(c) offense is the minimum term of imprisonment required by statute. USSG §2K2.4. Punishments under section 924(c) run consecutive to any other term of imprisonment. 18 U.S.C. § 924(c)(1)(D)(ii).

SOURCE: United States Sentencing Commission, FY 2016 through FY 2020 Datafiles, USSCFY16-USSCFY20.